PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3232
_____

ESTATE OF FRANK P. LAGANO,

                                Appellant

v.

BERGEN COUNTY PROSECUTOR'S OFFICE;
MICHAEL MORDAGA; VARIOUS JOHN DOE
AND JANE DOE DEFENDANTS,
whose individual identities or wrongful
acts are not now known to Plaintiff
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-12-cv-05441)
District Judge: Honorable Faith S. Hochberg
_____

Argued March 19, 2014

Before:   CHAGARES, GREENAWAY, JR., and
                VANASKIE, *Circuit Judges.*

(Filed October 15, 2014)

William H. Buckman, Esq.
William H. Buckman Law Firm
110 Marter Avenue, Suite 209
Moorestown, NJ 08057

Edward M. Koch, Esq.
White & Williams
1650 Market Street
1800 One Liberty
Philadelphia, PA 19103

David M. Ragonese, Esq. [Argued]
White & Williams
457 Haddonfield Road
Suite 400, Liberty View
Cherry Hill, NJ 08002
*Attorneys for Plaintiff/Appellant*

John J. Hoffman, Esq.
Lisa A. Puglisi, Esq.
Brian G. Flanagan, Esq. [Argued]
Eric S. Pasternack, Esq.
Office of Attorney General of New Jersey
PO Box 112
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625
*Attorneys for Defendants/Appellees*

———————————

OPINION

———————————

2

VANASKIE, *Circuit Judge.*

Frank P. Lagano was fatally shot on April 12, 2007, in front of a diner in East Brunswick, New Jersey. More than five years later, in August 2012, the Estate of Frank P. Lagano ("the Estate") filed suit against, inter alia, the Bergen County Prosecutor's Office (the "BCPO") and former BCPO Chief of Detectives Michael Mordaga, alleging that BCPO personnel improperly revealed to members of organized crime that Lagano was an informant and this disclosure led to Lagano's murder. Specifically, the Estate contends the alleged disclosure of Lagano's status as a confidential informant established a state-created danger in violation of his due process rights. The Estate also challenges a December 2004 search of Lagano's home and seizure of his property. The BCPO and Mordaga (collectively, "Appellees") each filed motions to dismiss the Estate's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The District Court granted both motions and dismissed the Estate's claims in their entirety. For the reasons that follow, we will affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

According to the Estate, Lagano and Michael Mordaga shared a long-term business and personal relationship.[1]

---

[1] As is required when reviewing a district court's dismissal under Rules 12(b)(1) and 12(b)(6), our recitation of the facts assumes the truthfulness of the Estate's well-pled allegations. *Rea v. Fed. Investors*, 627 F.3d 937, 940 (3d Cir.

3

Lagano was also the subject of an organized crime investigation by the BCPO, where Mordaga served as Chief of Detectives. On December 1, 2004, BCPO detectives executed a search warrant at Lagano's home in New Jersey, during which they seized more than $50,000 in cash along with other items. Detectives from the BCPO also executed search warrants on Lagano's safe deposit boxes, which resulted in the seizure of additional funds. Lagano was charged with several crimes, including racketeering, promoting gambling, criminal usury, and conspiracy.

After Lagano was charged, Mordaga allegedly brought Lagano to his office and instructed him to retain a specific attorney with the assurance that the attorney could "make his legal problems go away." (Estate's Br. 12.) Lagano did not follow Mordaga's instructions. Instead, according to the Estate's allegations, Lagano agreed to serve as a confidential informant for James Sweeney, who was employed at the time as an investigator with the Criminal Justice Division of the New Jersey Attorney General's Office ("the DCJ").

Mordaga subsequently attended a dinner meeting with Lagano, where he once again urged Lagano to hire the attorney he recommended, assuring him that, if he did so, "half his money would be returned and . . . [he] would serve no prison time." (App. 31a ¶ 28.) Lagano rejected Mordaga's offer, and their relationship "soured." (*Id.* 30a ¶ 21.)

---

2010); *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

The Estate avers that sometime thereafter, "[BCPO] personnel . . . disclosed to alleged members of traditional Organized Crime families . . . that [Lagano] had been an informant." (*Id.* 32a ¶ 32.) On April 12, 2007, more than two years after his arrest, Lagano was shot and killed. The Estate argues that Lagano's death resulted from the actions of Mordaga and other BCPO employees, who allegedly "conspired to illegally arrest and steal funds from Lagano in 2004 and, then, intentionally, and with reckless disregard for Lagano's safety, conspired to disclose Lagano's status as a confidential informant to known members of Organized Crime." (Estate's Br. 9.)

On August 29, 2012, the Estate filed a three-count complaint against the State of New Jersey, the BCPO, Mordaga, and various John and Jane Doe Defendants. The bulk of the Estate's factual averments were based on allegations made by James Sweeney, who is now deceased, in a complaint he filed in 2010 ("the Sweeney Complaint").[2]

---

[2] Sweeney served as Sergeant State Investigator for the DCJ. Following the termination of his employment in September 2008, Sweeney filed suit against the State of New Jersey, the New Jersey Attorney General's Office, the DCJ, and several officers, alleging a violation of the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"), N.J. Stat. Ann. §§ 2C:41-1 *et. seq.* The Sweeney Complaint alleged widespread corruption within the BCPO, which he believed was involved in "business dealings with alleged members of Organized Crime families and the unlawful seizure, retention and use of monies by high ranking members of that County's Prosecutor's Office." (App. 114a.) It also alleged that several officials at the DCJ knowingly

5

The Estate contends that it discovered the facts relevant to this appeal through the Sweeney Complaint.

The Estate filed a first amended complaint (hereinafter, "the amended complaint") on December 12, 2012, which asserts the same claims as averred in the original complaint but omits the State of New Jersey as a defendant. Count 1 presents a due process claim under the state-created danger theory, asserting that Appellees violated Lagano's rights by disclosing his identity as a confidential informant, thus proximately causing his death. Count 2 asserts the same claim, but under the New Jersey Constitution, made actionable via the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-1 to -2 ("NJCRA"). Count 3 asserts violations of the Fourth Amendment's prohibition against unreasonable searches and seizures, made actionable by 42 U.S.C. §§ 1983 and 1985.

---

attempted to obstruct Sweeney's investigation into this corruption.

Most relevant to this appeal, the Sweeney Complaint included allegations related to Mordaga's relationship with Lagano, the BCPO's organized crime investigation, and the search and seizure at Lagano's home, which Sweeney claimed was improper. Significantly, following Lagano's murder on April 12, 2007, Sweeney alleged that he sent an email to a superior "advising him of sensitive data concerning [Mordaga] and [Lagano's] relationship," because he believed this data "could potentially have created a motive for [Lagano's] murder." (App. 116a.)

6

The BCPO filed a motion to dismiss, and the District Court granted the motion on March 22, 2013. Mordaga then filed a motion to dismiss, which the District Court granted on June 19, 2013. The Estate filed this timely appeal.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction under 28 U.S.C. 1291. We review de novo a district court's dismissal under Rule 12(b)(1), *see Common Cause of Pa. v. Pa.*, 558 F.3d 249, 257 (3d Cir. 2009), as well as Rule 12(b)(6), *see Wiest v. Lynch*, 710 F.3d 121, 128 (3d Cir. 2013).

## III.

The District Court's dismissal rested on several alternative theories: the District Court dismissed all counts on the basis that neither Mordaga nor the BCPO is a "person" amenable to suit under 42 U.S.C. § 1983, § 1985, or the NJCRA; it dismissed all counts against the BCPO on the basis that the BCPO is entitled to Eleventh Amendment sovereign immunity; it dismissed Counts 1 and 2 against Mordaga on the basis that he is entitled to qualified immunity; and it dismissed Count 3 on the alternative basis that it is barred by the statute of limitations. We will discuss each in turn.

### A.   The BCPO and Mordaga as "Persons"

We begin with the question of whether Appellees are "persons" amenable to suit under 42 U.S.C. § 1983, §1985, or the NJCRA. In its March 22, 2013 opinion, the District Court held that the BCPO is not a "person" subject to liability under

these provisions.  In its June 19, 2013 opinion, the District Court concluded that Mordaga is not a "person" subject to suit under the federal civil rights laws.  Because the District Court erred in reaching these conclusions, we will vacate the dismissal on this ground.

1.  Sections 1983 and 1985

Section 1983 imposes liability on "[e]very *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983 (emphasis added).  Section 1985 imposes liability "if two or more *persons*" conspire to interfere with civil rights in a manner enumerated therein.  *Id.* § 1985 (emphasis added).[3]

---

[3] We have never explicitly decided whether the term "person" has the same meaning under §§ 1983 and 1985. Nevertheless, the district courts in our Circuit have consistently answered that question in the affirmative.  *See, e.g.*, *Carabello v. Beard*, 468 F. Supp. 2d 720, 723 n.2 (E.D. Pa. 2006); *Wright v. Phila. Hous. Auth.*, No. 94-1601, 1994 WL 597716, at *2-3 (E.D. Pa. 1994); *Rode v. Dellarciprete*, 617 F. Supp. 721, 723 n.2 (M.D. Pa. 1985).  Here, neither party argues that "person" means something different under § 1985 than under § 1983, and we see no reason why this should be so.  We, like our sister Court of Appeals in *Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979), therefore assume that "person" has the same meaning under both §§ 1983 and 1985.

8

The District Court found that the BCPO was an arm of the State of New Jersey, and that Mordaga, as BCPO Chief of Detectives, was a state official. In *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), the Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." [4] Local governmental bodies and their officials, by contrast, are regarded as "persons" amenable to suit under § 1983. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).

Because local governmental bodies and their officials are "persons" under §§ 1983 and 1985, and state agencies and their officials acting in their official capacity are not, we must decide initially whether the BCPO is an arm of the State of New Jersey or of Bergen County. If the BCPO is an arm of the State of New Jersey, we must then decide whether Mordaga has been sued exclusively in his official capacity as BCPO Chief of Detectives. [5]

Our resolution of the first question—whether the BCPO is an arm of the State—is guided by *Coleman v. Kaye*, 87 F.3d 1491 (3d Cir. 1996). In *Coleman*, we held that "when [New Jersey] county prosecutors engage in classic law

_____

[4] As to officials of the State, the Court in *Will* explained that "[o]bviously, state officials literally are persons[,] [b]ut a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." 491 U.S. at 71.

[5] Of course, a state official sued in his or her personal capacity is amenable to suit under §§ 1983 and 1985. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991).

9

enforcement and investigative functions, they act as officers of the State." *Coleman v. Kaye*, 87 F.3d 1491, 1505 (3d Cir. 1996). When county prosecutors perform administrative functions "unrelated to the duties involved in criminal prosecution," however, they act as county officials. *Id.* at 1505–06.

Here, the District Court found that "the BCPO was acting within its classical function of investigating criminal activities and conducting criminal prosecutions with respect to Mr. Lagano." (App. 13a.) Similarly, the District Court found that Mordaga "was acting as the Chief of Detectives in the BCPO, a state agency," and that Mordaga was acting "in his official capacity in connection with the allegations made by Lagano's Estate." (App. 8a.) Based upon these findings, the District Court concluded that neither the BCPO nor Mordaga were amenable to suit under §§ 1983 and 1985, and dismissed those claims accordingly.

It is, of course, true that in some respects the amended complaint avers activity within the BCPO and actions taken by Mordaga that fall within the ambit of "classic law enforcement and investigative functions." *Coleman*, 87 F.3d at 1505. But the amended complaint must be read as a whole, and its averments and the inferences reasonably drawn from those averments must be viewed in the light most favorable to the plaintiff. *See S.H. ex rel. Durell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 256 (3d. Cir. 2013). In this case, the amended complaint is replete with allegations that Mordaga and others within the BCPO were not performing the classic functions of law enforcement or criminal investigators.

For instance, the amended complaint alleged that Lagano and Mordaga "enjoyed a personal and business

10

relationship," (App. 29a ¶ 11), which included "vacation[ing], visit[ing,] . . . socializ[ing,]" and "multiple business ventures." (*Id.* ¶ 12, 14.) The amended complaint also alleged that Mordaga met with Lagano after Lagano's home was searched, provided him with the name of a specific attorney, and assured Lagano that, if he retained this attorney, "90% of [his] problems would go away." (*Id.* 30a ¶ 20.) After Lagano failed to retain the recommended attorney, the amended complaint averred that Mordaga attended a "dinner meeting," during which Mordaga advised Lagano that "half his money would be returned and guaranteed that [Lagano] would serve no prison time if [he] hired the attorney Mordaga recommended." (*Id.* 31a ¶ 27.) As to the disclosure of Lagano's identity as a confidential informant, the amended complaint alleged that "[BCPO] personnel thereafter disclosed to alleged members of traditional Organized Crime families arrested in raids on December 1, 2004 that [Lagano] had been an informant." (*Id.* 32a ¶ 32.)

The amended complaint clearly alleges that Mordaga's relationship with Lagano extended beyond Mordaga's official role as BCPO Chief of Detectives during the BCPO investigation of Lagano. It can also reasonably be inferred from the allegations that Mordaga was not performing classic investigatory and prosecutorial functions when he urged Lagano to retain a specific attorney on the assurance that this attorney could make Lagano's problems disappear. It can also be inferred from the amended complaint that the alleged disclosure of Lagano's status as a confidential informant was unrelated to any lawful investigative or prosecutorial

11

function.[6]  These allegations support a reasonable inference that neither Mordaga nor the BCPO acted within their classic investigatory and prosecutorial functions with respect to the state-created danger claim advanced by the Estate. Accordingly, the District Court erred in holding that the amended complaint alleged that the BCPO and Mordaga acted exclusively in classic law enforcement and investigative functions so as to make them part of the State and thus not amenable to suit under §§ 1983 and 1985.

Even if the amended complaint could not be viewed as alleging conduct outside classic law enforcement and investigative functions, the dismissal as to Mordaga was incorrect for an additional reason. Mordaga is sued not only in his official capacity, but also in his personal capacity. (*See* Estate Br. 31.) Accordingly, he most certainly is amenable to suit as a "person" under §§ 1983 and 1985. *See Hafer*, 502 U.S. at 27. In *Hafer*, the Supreme Court explicitly rejected the theory that "state officials may not be held liable in their personal capacity for actions they take in their official capacity." *Id.* Thus, under *Hafer*, the District Court erred in

---

[6] Lagano's complaint intermittently describes this disclosure in language that suggests it was intentional (*see, e.g.*, App. 32a ¶ 32 ("[BCPO] personnel thereafter disclosed . . .")), and in language that suggests it may have been inadvertent (*see, e.g.*, *id.* ¶ 36 ("By failing to protect from disclosure . . . .")). The District Court is free to consider, therefore, whether the complaint sufficiently pled the requisite affirmative act on the part of the BCPO or Mordaga that is required to state a claim under the state-created danger theory. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

12

dismissing the amended complaint against Mordaga in his personal capacity.

2.    New Jersey Civil Rights Act

In addition to bringing suit under the federal civil rights statutes, the Estate raised a claim under the NJCRA, N.J. Stat. Ann. § 10:6-1 to -2.  Like 42 U.S.C. § 1983, the NJCRA "premise[s] liability on the conduct of a 'person.'" *Lopez-Siguenza v. Roddy*, No. 13-2005 (JBS/JS), 2014 WL 1298300, at *7 (D.N.J. Mar. 31, 2014).  New Jersey district courts have interpreted the NJCRA as having incorporated the Supreme Court's decision in *Will* that, for purposes of § 1983, states and state officials acting in their official capacity are not amenable to suit.  *See id.* at *5; *Didiano v. Balicki*, Civ. No. 10-4483 (RBK/AMD), 2011 WL 1466131, at *8 (D.N.J. Apr. 18, 2011); *Slinger v. New Jersey*, Civ. No. 07-5561 (DMC), 2008 WL 4126181, at *7–8 (D.N.J. Sept. 4, 2008), *rev'd in part*, 366 F. App'x 357 (3d Cir. 2010).  Because the District Court erred in concluding at this stage that neither the BCPO nor Mordaga were "persons" amenable to suit under §§ 1983 and 1985, it likewise erred in concluding that they are not "persons" under the NJCRA. [7]  Accordingly, we will vacate the dismissal of Count 2 on that ground as well.

---

[7] The District Court and the parties cite N.J. Stat. Ann. § 1:1-2, which defines "person" for purposes of New Jersey law as:

> corporations, companies, associations, societies, firms, partnerships and joint stock companies as well as individuals,

13

B.  Eleventh Amendment Sovereign Immunity

The District Court also dismissed the amended complaint as to the BCPO on the alternative basis that the

> unless restricted by the context to an individual as distinguished from a corporate entity or specifically restricted to 1 or some of the above enumerated synonyms and, *when used to designate the owner of property which may be the subject of an offense, includes this State,* the United States, any other State of the United States as defined infra and any foreign country or government lawfully owning or possessing property within this State.

(emphasis added).  The District Court's analysis focused solely on whether the state was used here "to designate the owner of property which may be the subject of an offense," and concluded that it was not.  While we agree with the District Court that this exception for property disputes is not implicated here, we must nevertheless vacate the dismissal pursuant to the NJCRA because the District Court's analysis assumes that the BCPO and Mordaga acted as agents of the state, and we hold that the District Court erred in drawing that conclusion at this stage.

14

BCPO is protected by Eleventh Amendment sovereign immunity. The Eleventh Amendment of the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

Sovereign immunity extends to state agencies and state officers, "as long as the state is the real party in interest." *Fitchik v. N.J. Transit Rail Operations*, 873 F.2d 655, 659 (3d Cir. 1989). It does not extend to counties and municipalities. *Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 813 (3d Cir. 1991) ("[A]lthough political subdivisions of a state, such as counties and municipalities, fall within the term 'State' as used in the Fourteenth Amendment, political subdivisions are not 'State[s]' under the Eleventh Amendment."). To determine whether the state is the real party in interest, this Court considers three factors: (1) whether the money to pay for the judgment would come from the state; (2) the status of the agency under state law; and (3) what degree of autonomy the agency has. *Fitchik*, 873 F.2d at 659.

Rather than applying *Fitchik* to the facts alleged by the Estate to reach the conclusion that the BCPO was entitled to Eleventh Amendment sovereign immunity, the District Court relied solely on our decision in *Coleman*. The District

15

Court's reading of *Coleman* is erroneous. First, *Coleman* never mentions *Fitchik*. And second, *Coleman* does not address Eleventh Amendment sovereign immunity. Instead, *Coleman* focuses on the question of what entities and public officials may be regarded as arms and officials of the State for the purpose of determining whether the named entity and public official are to be regarded as "persons" subject to suit under § 1983. The District Court's analysis improperly conflates the jurisprudence interpreting the term "person" in the context of § 1983 with the concept of Eleventh Amendment sovereign immunity. Although the existence of Eleventh Amendment sovereign immunity was a factor considered by the Supreme Court in *Will*, the two concepts are analytically distinct. *See Hafer*, 502 U.S. at 30 ("Most certainly, *Will's* holding does not rest directly on the Eleventh Amendment.").

Appellees point to our unpublished decision in *Beightler v. Office of Essex Cnty. Prosecutor*, 342 Fed. App'x 829, 832 (3d Cir. 2009) (per curiam), which stated that *Coleman* "essentially analyzed the same factors presented in *Fitchik*," as support for the District Court's conclusion that the *Fitchik* factors are met any time a court finds that county prosecutors act as arms of the state by performing classic law enforcement functions. However, we are not bound or persuaded by *Beightler*'s statement that the *Fitchik* inquiry is satisfied whenever a county prosecutor engages in classic prosecutorial functions. We therefore conclude that *Fitchik* provides the proper framework for analyzing Eleventh Amendment sovereign immunity as it applies to county prosecutors, and on remand the District Court must apply

16

*Fitchik* to determine whether the BCPO is entitled to Eleventh Amendment sovereign immunity in this case.[8]

C.   Qualified Immunity

We turn now to the District Court's finding that Mordaga is protected by qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To resolve a claim of qualified immunity, a court must engage in a two-pronged analysis to decide (1) whether the plaintiff alleged sufficient facts to establish the violation of a constitutional right, and (2) whether the right was "clearly established" at the time of the defendant's actions. *Id.* at 232.

The Estate's claim is grounded in the Due Process Clause of the Fourteenth Amendment, which provides that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, §

---

[8] Of course, the fact that we have held that the amended complaint does not allege that the BCPO was acting at all times within its classic prosecutorial investigative capacity is enough to undermine the District Court's Eleventh Amendment ruling. We emphasize, however, that the Eleventh Amendment inquiry is analytically distinct from the question of whether a county entity is a "person" for § 1983 purposes, and *Fitchik* controls the Eleventh Amendment inquiry.

1.     We have recognized that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." *Phillips*, 515 F.3d at 235. In general, this liberty interest does not require the state to affirmatively protect its citizens. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989). One exception to this general rule is the state-created danger theory, and it is under this theory that the Estate proceeds on its due process claims.

To establish a claim under the state-created danger theory, a plaintiff must prove that:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or

18

that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and footnotes omitted).

The Estate asserts that Appellees—either Mordaga or another employee within the BCPO—disclosed Lagano's status as a confidential informant to members of organized crime families, and that this disclosure established a state-created danger that resulted in his murder. Mordaga responded that he is entitled to qualified immunity on the state-created danger claims because the Estate failed to establish either a violation of a constitutional right, or that the constitutional right was clearly established at the time of the alleged violation.

The District Court focused on the second prong of the qualified immunity analysis, holding that the constitutional right claimed to have been violated was not clearly established at the time of Lagano's murder. In reaching this conclusion, the District Court reasoned that because "[t]here are no published cases that extend the state created danger right to confidential informants in the Third Circuit[,] . . . it would be unfair to hold that a constitutional right was 'clearly established.'" (App. 6a–7a.) The District Court defined the right asserted by the Estate as "a confidential informant's constitutional right to nondisclosure." (*Id.*)

We cannot endorse the District Court's unduly narrow construction of the right at issue, or its statement that the right was not clearly established. It has been clearly established in this Circuit for nearly two decades that a state-created danger

19

violates due process.  *See Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996) (holding that state-created danger theory is "viable mechanism for establishing a constitutional violation.").  That we have not applied the state-created danger theory in the context of a confidential informant is not dispositive on the qualified immunity defense.  As the Supreme Court explained in *Hope v. Pelzer*, 536 U.S. 730 (2002), "[a]lthough earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."  *Id.* at 741 (internal citation and quotation marks omitted).  Thus, the Estate can overcome Mordaga's qualified immunity defense without proving that we have previously issued a binding decision recognizing a state-created danger in the context of the disclosure of a confidential informant's status, and the District Court erred in requiring it to do so.

The focus of the qualified immunity inquiry is on the allegations made by the Estate.  Specifically, the question is whether the facts averred by the Estate fall within the elements of the state-created danger theory, and whether "it would be clear to a reasonable officer" that the alleged disclosure was unlawful under the circumstances.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  We express no opinion as to whether the amended complaint satisfies these inquiries, but, because the District Court failed to apply the proper standard, we must vacate the District Court's decision in favor of Mordaga on the qualified immunity defense.

D.  Statute of Limitations

The District Court dismissed Count 3 on the alternative basis that it is barred by the statute of limitations.

20

In determining the length of the statute of limitations for a claim arising under § 1983, courts must apply the limitations period applicable to personal-injury torts in the State in which the cause of action arose. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In New Jersey, where Lagano's claim arose, personal injury claims are governed by a two-year statute of limitations. N.J. Stat. Ann. § 2A:14-2.[9] Consequently, the statute of limitations for Count 3, which asserts a violation of the Fourth Amendment's prohibition against unreasonable searches and seizures made actionable under §§ 1983 and 1985, is two years. Because the Estate did not file suit until August 29, 2012, the cause of action, to be timely, cannot have accrued earlier than August 29, 2010.

The date of accrual of a § 1983 claim is a matter of federal law. *Wallace*, 549 U.S. at 388. We have described that inquiry as follows:

> Accrual is the occurrence of damages caused by a wrongful act—"when a plaintiff has 'a complete and present cause of action,' that is, when 'the plaintiff can file suit and obtain relief.'" [*Wallace*, 539 U.S. at 388] (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund*

---

[9] N.J. Stat. Ann. § 2A:12-2(a), in pertinent part, provides that "[e]very action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within 2 years next after the cause of such action shall have accrued . . . ."

21

*v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). As the Court in *Wallace* explained, "'the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages.'" *Id.* at 391 (quoting 1 Calvin W. Corman, Limitation of Actions § 7.4.1 (1991)).

*Dique v. N.J. State Police*, 603 F.3d 181, 185–86 (3d Cir. 2010).

Here, the search of Lagano's home took place on December 1, 2004. On January 13, 2005, the BCPO brought a forfeiture action against Lagano under N.J. Stat. Ann. § 2C:65-1, claiming that a total of $265,428 was seized from Lagano during the search. Lagano filed an answer to the forfeiture action in 2005, and the Estate was substituted in Lagano's place following his death in 2007. Without arguing for any specific date, Appellees contend that "[a]t the very latest, the theft claim accrued in 2007, when the Estate became a party to the forfeiture action," and that as a result, the statute of limitations would have run at the latest in 2009. (Appellees' Br. 40.) The District Court agreed, finding that the Estate "knew or should have known about the search and seizure claims at the time of filing of Lagano's Answer on March 9, 2005, or at the latest, in 2007, when the Estate became involved in that action." In this regard, the District Court observed that "[u]pon substitution into the forfeiture action, the Estate had access to Lagano's documents and filings involving the search and seizure matters." (App. 16a.)

22

The Estate argues that the cause of action did not accrue until Sweeney filed his complaint in federal court in September 2010.[10] Although Lagano filed an answer to the forfeiture action in 2005, the Estate still argues that the answer "merely acknowledges Lagano's awareness of the search and seizure, not the illegality of it," and that the answer therefore did not put the Estate on notice that Lagano's rights were violated. (Appellant's Br. 45.) Thus, according to the Estate, the cause of action did not accrue until the Sweeney Complaint was filed in September 2010, and the statute of limitations did not expire until September

---

[10] The relevant allegations in the Sweeney Complaint state that members of the BCPO "confiscated the monies from [Lagano's] home and failed and/or refused to provide the family with a receipt of same when they requested an inventory," (App. 111a ¶ 28), "searched the safe deposit box only after directing the bank representative to leave the room," (*id.* ¶ 30), "seized items from [Lagano's] safe deposit box and failed and/or refused to provide a receipt of same," (*id.* ¶ 31), and that "after the arrest, [Lagano's] relationship with [Mordaga] soured in part because [Lagano] claimed not all of his money and property was returned to him." (*Id.* 112a ¶ 36.) Perhaps most relevant to the claim asserted in Count 3, the Sweeney Complaint also states that Sweeney "advised his superiors . . . of potential corruption within the hierarchy of that County Prosecutor's Office, including business dealings with alleged members of Organized Crime families *and the unlawful seizure, retention and use of monies by high ranking members of that County Prosecutor's Office.*" (*Id*. 114a ¶ 50 (emphasis added).)

2012. Under this theory, the Estate's August 2012 complaint would be timely.

The Estate's arguments are unpersuasive. Lagano's home was searched and his property was seized in December 2004, giving rise to the claim for damages. The record demonstrates that Lagano himself knew about the allegedly unlawful search and seizure by March 2005 at the latest, and thus had a complete cause of action at that time. *See Dique*, 603 F.3d at 185–86. As a result, the two-year period of limitations expired in March 2007, before Lagano's death the following month. We therefore hold that Count 3 is barred by the statute of limitations, and we will affirm the District Court's dismissal of Count 3 accordingly.

IV.

We must address one final issue. The Estate argues that it should be permitted to file a second amended complaint upon remand. We agree. We have held that whether or not a plaintiff seeks leave to amend, a district court considering a 12(b)(6) dismissal "must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 245 (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)). Here, the District Court dismissed the Estate's complaint against the BCPO with prejudice without making a finding that further amendment would be futile. This, too, was improper. The Estate must be permitted to file a second amended complaint unless the District Court makes a finding of futility.

## V.

For the foregoing reasons, we will affirm in part and vacate in part the judgment entered by the District Court, and remand for further proceedings consistent with this opinion.