**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-4590

_____

LIZETTE VARGAS,
Individually & In Her Capacity as Administratrix of
Estate of Tabitha Elaine Gonzalez Deceased,
                                                            Appellant

v.

CITY OF PHILADELPHIA;
POLICE OFFICER MATTHEW BLASZCZYK;
POLICE OFFICER KEITH WHITE;
JOHN DOES 1-10

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cv-2639)
District Judge:  Hon. Thomas N. O'Neill, Jr.

_____

Argued
January 21, 2015

Before:  FISHER, JORDAN, and GREENAWAY, JR.,
          *Circuit Judges*.

_____

James E. Hockenberry, Esq.   [ARGUED]
Law Office of Leon Aussprung
2005 Market Street – Ste. 2300
Philadelphia, PA   19103
        *Counsel for Appellant*

Jane L. Istvan, Esq.   [ARGUED]
Mark Maguire, Esq.
Amanda C. Shoffel, Esq.
City of Philadelphia
Law Department
1515 Arch Street – 17th Fl.
Philadelphia, PA   19102
        *Counsel for Appellees*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

Appellant Lizette Vargas challenges an order from the United States District Court for the Eastern District of Pennsylvania granting summary judgment against her on her constitutional and state-law claims against the City of Philadelphia ("the City") and two Philadelphia police officers (collectively, with the City, the "City Defendants"). She brought those claims on her own behalf and on behalf of the estate of her daughter, Tabitha Gonzalez, based on events

associated with Tabitha's death from asthma. Although the underlying circumstances of the case are tragic, the District Court's legal conclusion was correct, and we will affirm.

## I. BACKGROUND

### A. Factual Background[1]

On the night of August 19, 2009, shortly before midnight, 15-year old Tabitha began suffering from an asthma attack while at her home in North Philadelphia. Her mother, Ms. Vargas, who was also at home, suggested that she use her inhaler and nebulizer. While Tabitha was using the nebulizer, the severity of the asthma attack prompted Vargas to call 911 for emergency assistance.

As she waited for the paramedics to arrive, Vargas went outside and found Tabitha lying on the sidewalk in front of the house. At first, Tabitha was conscious and gasping for air, but she quickly lapsed into unconsciousness. Tabitha's cousin Maritza Rojas performed CPR on her, but it was unsuccessful. Erik Franklin – Maritza's boyfriend –and two neighbors lifted Tabitha into the backseat of a car belonging

---

[1] We note the conflicting stories emerging from the interaction Vargas had with the police, but we construe the facts in the light most favorable to her, the party opposing summary judgment. *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 257 (3d Cir. 2012) ("When reviewing a grant of summary judgment the court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." (internal quotation marks omitted)).

to Julia Diaz, another of Tabitha's cousins, so that Diaz could take her to the hospital. During this time, Vargas and Diaz both dialed 911, placing five separate and understandably frantic calls between 12:08 a.m. and 12:14 a.m. In response to a report of "a person screaming" made at 12:10 a.m. and 40 seconds, the Police Communications Center dispatched police officers Keith White and Matthew Blaszczyk at 12:11 a.m. and 16 seconds.[2] (App. at 152-54, 157.) Neither officer was made aware that the call was regarding a medical

---

[2] A "computer-aided dispatch" (or "CAD") report is generated by the police communications center when a dispatcher receives a 911 call. The computer system records information related to the call, including police response and activity. For example, it notes when officers input information in the computer terminal located in their patrol vehicle, called a mobile data transmitter ("MDT"). The officers push a button on the MDT to report when they are en route to a location and when they have arrived.

emergency.[3]  The police dispatch report notes that the officers arrived at Vargas's home at 12:13 a.m. and 56 seconds.[4]

The events immediately following the arrival of Officers White and Blaszczyk are in dispute.  Vargas testified that Franklin and Tabitha were in the backseat of Diaz's car while Vargas was in the front passenger seat and Diaz, as the driver, had pulled the car partly out of its parking spot at the curb when the police officers stopped their car so that it blocked Diaz's.  According to Vargas, the officers' vehicle was positioned so that its back door prevented her from opening her passenger-side door.  She claims that, as an officer approached, she banged on her door to "let [the

---

[3] Calls are coded as "a person screaming" when the dispatcher is unable to communicate with the person on the line and the operator can only hear screaming.  Other 911 calls made by Ms. Vargas that night were coded for "hospital cases," i.e., medical emergencies, and referred to the Fire Department for a response.  (App. at 151, 153.)  There was evidence that the 911 computer system cross referenced the medical emergency calls with the report of the woman screaming, but that information was not communicated to the officers who responded to the call.

[4] According to the CAD report, the "on scene" button on the MDT registered to Officers Blaszczyk's and White's patrol vehicle was pushed at 12:13 and 56 seconds.  *See supra* note 2.  Vargas notes, however, that police records show the officers ran a vehicle tag at 12:13 and 42 seconds, suggesting that they arrived slightly before the time at which they pushed the "on scene" button.

officer] know that [she could not] open up the door," while Diaz rolled down her window and told the officer that they had Tabitha in the car and had to leave immediately. (App. at 85.) Vargas testified that, as Diaz was trying to explain their medical emergency, the officer walked in front of Diaz's car to the driver's side and said, "get the f*** out of the car, turn off the engine now." (App. at 86.) Diaz then turned off the engine and got out of the car. Because Vargas could not open her passenger-side door, she climbed over the center console and got out of the car through the driver-side door that Diaz had left open. At that point, Vargas said, the police officer pulled open one of the back doors, causing Tabitha to tumble partway out of the car and onto the ground. Vargas immediately attempted to move towards her daughter but was prevented from doing so by one of the officers, who, she said, "blocked" her. (App. at 87.)

Officers White and Blaszczyk testified that they did not impede the movement of any car when they pulled to a stop in front of the Vargas residence. They also claim that Tabitha was already on the sidewalk upon their arrival. Officer Blaszczyk testified that he saw "a female laying on the sidewalk" (App. at 296-97) as he got out of the patrol car, and Officer White similarly said he observed "two Hispanic males that were over top of a[] Hispanic female who was on the ground" (App. at 168). The officers assert that, along with the two Hispanic males, they attempted to move Tabitha into the car and "got her halfway into the car and she just didn't fit into the back door." (App. at 168.) Officer White testified that, as they were attempting to move Tabitha into the car, he heard the siren of an ambulance coming and "it was very clear [to him] that [they] were not going to get [Tabitha] into the back of the car and [so he] recommended

6

that [they] wait for the ambulance to arrive" because he could see it coming down Fifth Street. (App. at 168-69.) Officer White further explained that, "[a]s the ambulance was pulling up, the two females were screaming at [him and Officer Blaszczyk] that [if they did not] want to f***ing help, to get the f*** away from [Tabitha]." (App. at 169.) Officer White claims he stepped away from them and approached the ambulance as it arrived. Both officers assert that they did not prevent anyone from taking Tabitha to the hospital.

Acknowledging that she could not "be precise on the minutes," Vargas estimated that the police officers were on the scene for approximately 6 to 8 minutes before the ambulance arrived. (App. at 89.) Franklin – one of Vargas's witnesses – testified, however, that the officers were on the scene for "[m]aybe a minute, two minutes" before the ambulance arrived. (App. at 132.) Further, the contemporaneous police dispatch records indicate that, from the time the officers noted their arrival at the scene, *see supra* note 4, to the time the ambulance arrived, was just over one minute.[5] (*Compare* App. at 158 (officers arrived at

[5] As described by Vargas's witnesses, the ambulance arrived "almost simultaneously" with Emergency Medical Technicians ("EMTs") who came in a fire truck. The EMTs later recalled that they saw a large crowd of people at the scene who were "[s]creaming, hollering, fighting … amongst each other" and also that Tabitha was "half-in" the car and was unresponsive with no vital signs. (App. at 203-04.) They pulled Tabitha out of the car and onto the sidewalk and provided basic life support and CPR to her until the paramedics arrived. The EMTs do not figure further in the unfolding of events nor in the legal controversies at issue.

7

12:13:56), *with* App. at 277 (ambulance arrived at 12:15).) After their arrival, paramedics assisted Tabitha onto a stretcher, loaded her into the ambulance and provided CPR to her on the way to Temple University Hospital.[6] She arrived at the hospital at 12:28 a.m. and 31 seconds, approximately twenty minutes after Vargas's first call to 911. She had suffered a severe anoxic brain injury by the time of her arrival, was pronounced brain dead, taken off of life support, and died two weeks later on August 26, 2009.

### B.    Procedural History

Vargas initially filed a complaint on April 1, 2011, in the Philadelphia Court of Common Pleas, asserting claims against the City and officers of the Philadelphia Police Department listed as John Does 1-10. The City timely

---

[6] There are two different types of ambulances that respond to 911 calls: those with Advanced Life Saving Service ("ALS") crews and those with Basic Life Saving Service ("BLS") crews. ALS crews include paramedics who can intubate patients and perform other advanced medical treatments, while BLS crews can only provide basic life support. Vargas's 911 call was initially coded for the dispatch of an ALS crew but, at the time she called, all ALS crews were responding to other calls and a BLS crew was dispatched instead. The paramedics that arrived were thus only able to connect Tabitha to an automated external defibrillator and keep her airway open with a small piece of plastic. Vargas does not contend that the unavailability of an ALS crew gives rise to any cause of action against the City Defendants.

removed the case to federal court. Vargas then filed an amended complaint on August 18, 2011, naming Officers Blaszczyk and White as additional defendants and asserting in Count I that the officers violated her Fourteenth Amendment rights to be free from unlawful seizure and physical restraint and her right to seek medical care on Tabitha's behalf, in violation of 42 U.S.C. § 1983. She also claims, in Count II, that the officers violated Tabitha's right to be free from unlawful seizure, physical restraint, and cruel and unusual punishment and that they interfered with her "well-being, life and personal security" and substantive due process rights, in violation of 42 U.S.C. § 1983. The amended complaint also contains, in Count III, a claim against the City alleging a failure to properly train the police, and, in Count IV, state-law false imprisonment claims on her own behalf and for Tabitha.

After the close of discovery, the City moved for summary judgment, arguing that Vargas could not demonstrate a constitutional violation and, in the alternative, that the officers' conduct was shielded by qualified immunity. Vargas responded by pointing to the report submitted by her expert witness, Dr. Christopher Moen, an emergency room physician, who said that, had Vargas been able to take Tabitha to the hospital in Diaz's car without interruption from the police, Tabitha would have arrived at the hospital 6 to 8 minutes earlier than she did in the ambulance.[7] According to

---

[7] The 6 to 8 minute delay that Dr. Moen identified was based on police dispatch and hospital records, not on Vargas's recollection of the timing of events. Dr. Moen determined that Tabitha was placed in Diaz's car at 12:13 a.m. and that the time required to drive to the hospital from

9

Dr. Moen, that 6 to 8 minute delay "prevented [Tabitha] from receiving life-saving medical care" and "caused her to suffer a significant anoxic brain injury which led to designation of brain death." (App. at 377-79.) The District Court granted summary judgment against Vargas on all of her claims, including granting judgment *sua sponte* on the false imprisonment claims. Vargas then timely filed this appeal.

---

Vargas's home was 3 minutes and 42 seconds. Thus, Dr. Moen concluded that, had Vargas been able to transport Tabitha to the hospital as intended, Tabitha would have arrived no later than 12:17 a.m. Dr. Moen noted that the Emergency Medical Services report indicates that the ambulance arrived at the hospital at 12:23 a.m., while the hospital records indicate that that ambulance arrived at 12:25 a.m. Thus, Dr. Moen concluded that the delay in Tabitha's treatment was approximately 6 to 8 minutes.

## II. DISCUSSION[8]

### A. Unreasonable Seizure

#### 1. Seizure of Vargas and Tabitha

Vargas argues that the District Court erred in finding that neither she nor her daughter was seized within the meaning of the Fourth Amendment. A Fourth Amendment seizure occurs when the government terminates the freedom of an individual through means intentionally applied. *Brower v. Cnty. of lnyo*, 489 U.S. 593, 596-97 (1989). In other words, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). The test for the existence of a "show of authority" is an objective one and, as the Supreme Court stated in *California v. Hodari*, considers "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." 499 U.S. 621, 628 (1991). A seizure does not occur, however, when the individual does not yield or submit to the officer's show of

---

[8] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1367, and 1441. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's summary judgment rulings. *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 317 (3d Cir. 2014). A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

authority. *Id.* at 626; *see also United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009). The kinds of demonstration of authority that may constitute a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Crandell*, 554 F.3d 79, 85 (3d Cir. 2009) (internal quotation marks omitted) (quoting *Mendenhall*, 446 U.S. at 554).

Vargas argues that both she and Tabitha were seized when the officers used their police cruiser to block Diaz's car from leaving for the hospital, when the officers told Diaz to turn off the engine and instructed the occupants to get out of the car, and then when the officers prevented them from getting back in the car and leaving for the hospital after it was clear that a medical emergency was taking place.[9] Vargas

_____

[9] As to seizure by physical force, Vargas did not argue below that she was seized when the police officers used their patrol car to block Diaz's vehicle from leaving for the hospital. Instead, she argued that she was seized when the officers refused to allow her to approach her daughter. She makes passing references to that argument here, but, as the District Court concluded, it fails because the officers did not employ any physical force: they did not physically touch or restrain her and instead simply told her to "move back" away from her daughter and to "calm down." (App. at 87.) *See Hodari*, 499 U.S. at 625 ("[The alleged seizure] does not involve the application of any physical force; Hodari was untouched by Officer Pertoso at the time he discarded the cocaine."). Although the officers' conduct could have been

contends that the officers' conduct constituted a show of authority to which she submitted, and she contrasts her and Tabitha's behavior with that of the defendant in *Hodari*, who fled from police and was thus not seized because of his lack of submission to the officers' authority. *Hodari*, 499 U.S. at 626. Vargas emphasizes that she and Tabitha did not flee. Indeed, she says, despite desperately pleading with the officers to allow her to take her daughter to the hospital, she obeyed when they told her to get out of the vehicle and move away from Tabitha.

Although the parties devote significant effort to addressing the difficult question of whether a seizure occurred in this case, we need not resolve that issue because, as explained below, even if there were a seizure, the undisputed facts show that any such seizure was reasonable and therefore not a constitutional violation.

### 2. *Reasonableness of seizures*

The Fourth Amendment does not protect against all seizures; it only protects against those that are unreasonable.

---

sufficient under the "show of authority" prong to constitute a seizure, as discussed below, *see infra* pp. 11-17, any such seizure was reasonable.

Vargas also contends that the District Court erred in concluding that Tabitha was not seized because, in her unconscious state, she could not submit to the officers' show of authority. Again, because any seizure that may have occurred was reasonable, we do not need to resolve whether there was a seizure.

*United States v. Sharpe*, 470 U.S. 675, 682 (1985). Reasonableness is determined by balancing "the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the [individual]." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1995). While declining to concede that any seizure occurred, the City Defendants argue that, to the extent there was a seizure, it was reasonable under the community caretaking exception to the Fourth Amendment.

In *Cady v. Dombrowski*, the Supreme Court introduced the "community caretaking doctrine" when it held that a police search of a particular police officer's private vehicle for the officer's missing service revolver was not a Fourth Amendment violation because the search was undertaken not for a law enforcement purpose but out of "concern for the safety of the general public who might be endangered if an intruder removed a revolver" from the vehicle.[10] 413 U.S.

---

[10] We have previously given a synopsis of the relevant facts in *Cady*, as follows:

> In *Cady*, a Chicago police officer named Dombrowski was visiting in Wisconsin and reported to the local police that he had been in an automobile accident. The police picked him up and returned to the scene of the accident. Dombrowski had been drinking, appeared intoxicated to the officers, and offered conflicting versions of the accident. He informed the local officers that he was a Chicago policeman. The local officers believed that members of the Chicago police force were

14

433, 447 (1973). The Court noted that law enforcement officers often exercise "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. That community caretaking doctrine, as described in *Cady*, is an exception to the warrant requirement of the Fourth Amendment and allows police with a non-law enforcement purpose to seize or search a person or property

> required to carry a service revolver at all times, so, when no gun was found on Dombrowski's person, an officer checked the front seat and the glove compartment of the wrecked car, but to no avail. The effort to find the weapon was motivated by the obligation of the police "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." The police had the vehicle towed to a privately owned garage, where it was left parked outside. After taking Dombrowski to a local hospital for treatment of injuries he sustained in the accident, one of the Wisconsin officers returned to Dombrowski's car to again try to recover the service revolver … pursuant to standard departmental procedure "to protect the public from a weapon's possibly falling into improper hands." Upon opening the trunk, the officer discovered various items that linked Dombrowski to a murder.

*Ray v. Twp. of Warren*, 626 F.3d 170, 174-75 (3d Cir. 2010) (citations omitted).

"in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993).

Many courts, including our own, have considered the limits of the community caretaking doctrine. In *Ray v. Township of Warren*, Ray's estranged wife had gone to Ray's house to pick up their daughter for court-ordered visitation. 626 F.3d 170, 171-72 (3d Cir. 2010). Upon seeing someone moving inside the home, but receiving no response to her ringing of the doorbell or knocking on the door, the wife called the police. *Id.* Once the police arrived, she described the situation to them and expressed concern for her daughter's well-being. *Id.* The officers, some of whom were aware of the acrimonious divorce proceedings and child-custody dispute between the couple, also knocked on the door and called the telephone number for the residence, but received no response. *Id.* Thereafter, and without a valid warrant,[11] the officers entered the house to check on the child's well-being. *Id.* To justify their actions, the officers asserted the

---

[11] Prior to entering, the responding officers contacted a municipal court judge for guidance as to whether the officers could enter the home and look for the child without a warrant, and they received approval. Although the specifics of that conversation were unclear, the officers testified that they only sought advice regarding entering the home out of concern for the daughter's well-being; they did not regard the call as a request for a warrant. The magistrate judge however, understood the officers to be asking for an arrest warrant and issued such a warrant, though it was later voided. *Ray*, 626 F.3d at 172.

community caretaking exception to the Fourth Amendment's warrant requirement.

We ultimately held that the officers' actions were protected by qualified immunity, *id.* at 179, but we declined to extend the community caretaking exception to cover the officers' conduct. Instead, we indicated that *Cady*'s outcome depended on the distinction in Fourth Amendment jurisprudence between automobiles and homes, and we concluded that the community caretaking doctrine "cannot be used to justify warrantless searches of a home." *Id.* at 177. We expressly noted in that case, however, that we were not deciding "[w]hether that [doctrine] can ever apply outside the context of an automobile search." *Id.*

Some of our sister courts of appeals have, by contrast, decided that question and have upheld under the community caretaking doctrine not only evidentiary searches and seizures outside the home, but also the effective seizure of persons. *See, e.g., Lockhard-Bembery v. Sauro*, 498 F.3d 69, 75-76 (1st Cir. 2007) (applying community caretaking exception when officer ordered motorist to push her disabled car out of the roadway for the safety of the general public); *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006) (applying community caretaking exception when officers transported to a psychiatric hospital an unwilling individual who appeared to be hallucinating); *United States v. Rideau*, 949 F.2d 718, 720 (5th Cir. 1991) (applying community caretaking exception when officers stopped defendant for his own safety and the safety of others after observing him standing in the middle of the road at night, dressed in dark clothes, and apparently intoxicated), *vacated on other grounds*, 969 F.2d 1572 (5th Cir. 1992) (en banc).

17

We agree that the community caretaking doctrine can apply in situations when, as is arguably the case here, a person outside of a home has been seized for a non-investigatory purpose and to protect that individual or the community at large.[12] The undisputed facts show that the actions of Officers Blaszczyk and White were reasonable. They were responding to a volatile situation which they did not initially know involved a medical emergency, and any brief seizure that may have occurred was a result of the officers' concern for the safety of everyone involved. The officers were sent because of a dispatcher's report of a 911 call from a "person screaming" (App. at 152-54), which was an apt description. According to Vargas, when the officers pulled up next to Diaz's car, the occupants of the car began "screaming" at them (App. at 85), but the screaming did not immediately reveal the nature of the emergency. Once the officers realized that Tabitha needed medical attention, it was reasonable for them to direct Vargas to wait because an ambulance was within earshot and its arrival was apparently imminent.

---

[12] The City Defendants have not invoked the "emergency aid doctrine," which the Supreme Court describes as a subset of the exigent circumstances exception to the warrant requirement. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury."). We thus do not have occasion to evaluate that doctrine's applicability here.

Officer White testified that they intended to take Tabitha to the hospital, but then heard and saw an ambulance approaching "within a minute or two minutes." (App. at 175.) He further testified that he waited for the ambulance because paramedics are "better trained" for the type of situation the officers faced. (App. at 175.) Sergeant Starrs of the Philadelphia Police Department, who works for the Department's Research and Planning Unit and is responsible for writing policies and procedures used in the training of police officers, explained that officers are trained to wait for paramedics in certain situations because "medics … have the equipment and they have the personnel to ride in the back" with the patient, whereas when officers transport a patient, they "are in the front of the car driving" and "there is no nobody to attend to the patient in the back." (App. at 186.) It is undisputed that Tabitha did in fact receive medical care on the scene and on board the ambulance on the way to the hospital.

Finally, it is important to note that the encounter outside the Vargas home transpired within a few minutes. Although Vargas estimated that the police officers were on the scene for 6 to 8 minutes before the ambulance, Franklin – one of her witnesses – testified that the time between the officers' and the ambulance's arrival was "maybe a minute, two minutes." (App. at 132-33.) And the police dispatch records tend to confirm Franklin's testimony, showing that the officers were on the scene just over a minute before the ambulance arrived. (*Compare* App. at 158 (officers arrived at 12:13:56), *with* App. at 277 (ambulance arrived at 12:15).) Even accepting the longer time-span as the historical fact, though, the entire episode happened quickly. In such

19

circumstances, even if Vargas and Tabitha could be considered seized, the seizures were reasonable.[13]

## B.     Due Process Claim

Vargas also raises a Fourteenth Amendment substantive due process claim on her own behalf and on behalf of Tabitha. For herself, Vargas argues that the officers violated her Fourteenth Amendment right to "make decisions concerning the care, custody, and control" of her daughter. *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005) (internal quotation marks omitted). Her claim on behalf of Tabitha has three components: a "straight" Fourteenth Amendment claim based upon the officers' failure to allow Vargas to transport her to the hospital in violation of Tabitha's right to life; a special relationship claim that the

---

[13] The officers' conduct here would also be shielded by qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). The case law does not indicate any analogous factual circumstances that would have put the officers on notice that they cannot briefly detain individuals in response to an emergency call and to await trained medical transport without violating the Fourth Amendment. We had not, before today, expressly held that the community caretaking doctrine could justify the seizure of a person outside of a home, which suggests that, to the extent there was doubt, the law in this area was not "clearly established."

officers had a duty to render affirmative aid; and a state-created danger claim.

To sustain a substantive due process claim, a plaintiff must show that the particular interest in question is protected by the Fourteenth Amendment and that the government's deprivation of that interest "shocks the conscience." *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir. 2001). The shocks-the-conscience test applies regardless of the theory upon which the substantive due process claim is premised. *See Estate of Lagano v. Bergen Cnty. Prosecutor's Office*, 769 F.3d 850, 858 (3d Cir. 2014) (noting that, to establish a claim under the state-created danger theory, a plaintiff must prove that "a state actor acted with a degree of culpability that shocks the conscience"); *Nicini v. Morra*, 212 F.3d 798, 809-12 (3d Cir. 2000) (applying the shocks-the-conscience test in a "special relationship" case); *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010) (stating that, even assuming a "special relationship" existed, the plaintiffs "did not make out a substantive due process claim" because they did not "allege any behavior by defendants that would meet the legal definition of conscience-shocking conduct"); *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1141-42 (10th Cir. 2006) (stating that the shocks-the-conscience standard applies to both "special relationship" cases and "state created danger cases" (citations omitted)).

"The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999). A plaintiff faces the highest bar when the state actor accused of wrong-doing was

faced with a "'hyperpressurized environment'" requiring a snap judgment. *Sanford v. Stiles*, 456 F.3d 298, 308-09 (3d Cir. 2006) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 508 (3d Cir. 2003)). In such cases, we permit recovery only if the state actor had an actual intent to cause harm. *Id.* By contrast, "where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." *Id.* at 309 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998)). Importing aspects of Eighth Amendment jurisprudence, we have defined "deliberate indifference" as requiring "conscious[ ] disregard [of] 'a substantial risk of serious harm.'" *Ziccardi v. City of Phila.*, 288 F.3d 57, 66 (3d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). In any event, "[m]ere negligence is not enough to shock the conscience." *Sanford*, 456 F.3d at 311.

Here, the officers certainly did face a hyperpressurized environment. They came in response to a 911 call noted simply as "person screaming" and they in fact encountered a group of screaming, frantic adults and an unconscious child. No one disputes that the police arrived at a tense and chaotic scene, that they endeavored to determine what was happening, and that, when it was plain that there was a medical emergency and an ambulance was about to arrive, they had everyone wait for the paramedics. It is a stretch to say that these facts rise even to the level of negligence, let alone to deliberate indifference or an intent to harm. While the officers' behavior and language, as described by Vargas, may have been less than polite or compassionate, it was not actionable.

The cases Vargas relies upon are inapposite. In *Rivas v. City of Passaic*, paramedics misrepresented to the police that a patient had assaulted one of them, leading the police to restrain the patient and causing the patient to asphyxiate. 365 F.3d 181, 185-86, 189 (3d Cir. 2004). In *Kneipp v. Tedder*, police officers abandoned an intoxicated woman in freezing weather after separating her from her sober husband – her "private source of protection." 95 F.3d 1199, 1210 (3d Cir. 1996). Here, by contrast, the officers simply and sensibly decided to wait for the incoming ambulance that was seconds away. Unlike the government actors in the cases that Vargas cites, the police here assisted in a form of rescue – facilitating an ambulance pick-up – rather than arresting or abandoning the person in need of aid. Thus, the District Court did not err in granting summary judgment against Vargas on all of her substantive due process claims.

### C.     "Failure to Train" Claim

Relying on *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), Vargas next contends that the City of Philadelphia is liable for failing to preserve her constitutional rights, and that the District Court erred in granting summary judgment against her on that claim. Specifically, she argues that the City's police department failed to adequately train its police officers and failed to adopt appropriate policies to prevent Fourth and Fourteenth Amendment violations.

In *Monell*, the Supreme Court held that a municipality can be found liable under § 1983 only when the municipality itself causes the constitutional violation at issue. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). In order

23

to impose liability on a local governmental entity for failing to preserve constitutional rights, a plaintiff bringing a § 1983 claim must establish that: (1) she possessed a constitutional right of which she was deprived; (2) the municipality had a policy; (3) the policy "amount[ed] to deliberate indifference" to the plaintiff's constitutional right; and (4) the policy was the "moving force behind the constitutional violation." *Id.* at 389-91 (internal quotation marks omitted). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).

In this case, Vargas's claim fails at the first step. Because the officers did not violate any of her constitutional rights, *see supra* pp. 9-17 (no Fourth Amendment violation), 17-20 (no Fourteenth Amendment violation), there was no violation for which the City of Philadelphia could be held responsible. *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim."). The District Court thus did not err in granting summary judgment for the City on the *Monell* claim.

### D.     False Imprisonment Claim

Finally, Vargas argues that the District Court erred in *sua sponte* granting summary judgment on the state-law false imprisonment claims that she raised on her own behalf and for Tabitha. She does not appear to challenge the District Court's finding that neither she nor Tabitha were falsely imprisoned and instead argues only that the District Court

24

should have provided her with notice and an opportunity to brief the issue before granting summary judgment against her on the claims.

Assuming that Vargas has not waived her argument on the underlying merits of the false imprisonment claims,[14] she cannot succeed on those claims because the officers were entitled to immunity under Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. C.S. §§ 8541-8564. The PSTCA provides immunity to municipalities and its employees for official actions unless the employee's conduct goes beyond negligence and constitutes "a crime, actual fraud, actual malice, or willful misconduct." *Id.* § 8550. Willful misconduct has been defined by the Pennsylvania Supreme Court as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (quoting *King v. Breach*, 540 A.2d 976, 981 (Pa. 1988)) (internal quotation marks omitted). As the record makes clear, the officers'

---

[14] "[U]nder Federal Rule of Appellate Procedure 28(a)(3) and (5) and Third Circuit Local Appellate Rule 28.1(a), appellants are required to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief. It is well settled that if an appellant fails to comply with these requirements on a particular issue, the appellant normally has abandoned and waived that issue on appeal and it need not be addressed by the court of appeals." *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) (citations omitted).

actions here do not rise to the level of willful misconduct and thus Vargas cannot prevail on her false imprisonment claims. It is therefore immaterial whether the District Court erred in *sua sponte* granting summary judgment without first giving Vargas notice, as any such error would be harmless.

## III.   CONCLUSION

For the forgoing reasons, we will affirm the ruling of the District Court.