**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4640
_____

L.R., Parent and Natural Guardian of N.R., a minor

v.

SCHOOL DISTRICT OF PHILADELPHIA;
SCHOOL REFORM COMMISSION OF THE SCHOOL
DISTRICT OF PHILADELPHIA;
JAMES A. ROCCO, III, ESQ., as Administrator CTA of the
Estate of Reginald M. Littlejohn,
Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
E.D. Pa. No. 2-14-cv-1787)
District Judge:  Honorable Jan E. DuBois
_____

Argued February 11, 2016

Before:  FUENTES,[*]  KRAUSE, and ROTH, *Circuit Judges*

---

[*] Honorable Julio M. Fuentes assumed senior status on July
18, 2016.

(Filed: September 6, 2016)

Kerri E. Chewning
Archer & Greiner, P.C.
One Centennial Square
33 East Euclid Avenue
Haddonfield, NJ 08033

Jeffrey M. Scott      [ARGUED]
Archer & Greiner, P.C.
1650 Market Street
One Liberty Place, 32nd Floor
Philadelphia, PA 19103
        *Counsel for Appellants*

Charles L. Becker    [ARGUED]
Dominic C. Guerrini
Thomas R. Kline
Tracie L. Palmer
David C. Williams
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
        *Counsel for Appellee*

_____

OPINION

_____

2

FUENTES, *Circuit Judge*.

Teachers not only educate our children, but also provide them with sources of care and comfort outside the home. Recognizing that the threat of civil liability might discourage teachers and other public servants from taking on such significant roles, courts have developed a doctrine of qualified immunity that, in many instances, shields them from civil lawsuits. But there are exceptions and this is one of those cases.

In January 2013, a teacher in the Philadelphia School District allowed a kindergarten student to leave his classroom with an adult who failed to identify herself. The adult sexually assaulted the child later that day. In the early hours of the next morning, a sanitation worker found the child in a playground after hearing her cries. The child's parent sued the teacher, who claims he is immune from suit.

We hold that the parent's allegations sufficiently state a constitutional violation of the young child's clearly established right to be free from exposure by her teacher to an obvious danger. In short, we conclude that it is shocking to the conscience that a kindergarten teacher would allow a child in his care to leave his classroom with a complete stranger. Accordingly, we will affirm the District Court's denial of qualified immunity.

## I.    BACKGROUND

### A.    Factual Background

Because this case comes to us on a motion to dismiss, the allegations are taken from the complaint and are assumed true for purposes of this appeal. On an ordinary school day in January 2013, Christina Regusters entered W.C. Bryant Elementary School in Philadelphia, Pennsylvania, where Jane was enrolled as a kindergarten student.[1] Regusters proceeded directly to Jane's classroom, where she encountered Defendant Reginald Littlejohn, Jane's teacher. Per Philadelphia School District policy,[2] Littlejohn asked Regusters to produce identification and verification that Jane had permission to leave school. Regusters failed to do so. Despite this failure, Littlejohn allowed Jane to leave his classroom with Regusters. Later that day, Regusters sexually assaulted Jane off school premises, causing her significant physical and emotional injuries.

---

[1] We will refer to the child as "Jane" throughout this opinion. This name is fictitious and we use it for ease of reference.

[2] The complaint states that Philadelphia School District policy provides that only the principal or his/her designee, the assistant principal, or the teacher-in-charge may grant a release of students during the school day. The policy also states that (i) under no circumstances may a pre-kindergarten through eighth grade student be released without a properly identified adult, (ii) the adult's identification must be checked against school records, and (iii) the release must take place in the school office. Compl. (J.A. Vol. II 58-67) ¶¶ 15-16.

### B. Procedural Background

Jane's parent and natural guardian, L.R., filed this civil rights lawsuit under 42 U.S.C. § 1983 against Reginald Littlejohn in his individual capacity, the School District of Philadelphia, and the School Reform Commission of the School District of Philadelphia (collectively, the "Defendants"). L.R. alleges that Littlejohn deprived Jane of her Fourteenth Amendment rights under a state-created danger theory. Specifically, L.R. alleges that by releasing her daughter to an unidentified adult, Littlejohn created the danger that resulted in Jane's physical and emotional harm. Defendants moved to dismiss under the Federal Rules of Civil Procedure, arguing that the complaint does not allege a constitutional violation and, even if it did, Littlejohn is entitled to qualified immunity.[3]

The District Court denied Defendants' motion. It explained that "ordinary common sense and experience dictate that there is an inherent risk of harm in releasing a five-year-old [child] to an adult stranger who has failed to produce identification and authorization for release despite being asked to do so."[4] For the reasons that follow, we will affirm.[5]

---

[3] *See* Fed. R. Civ. P. 12(b)(6).

[4] *L.R. v. Sch. Dist. of Phila.*, 60 F. Supp. 3d 584, 590 (E.D. Pa. 2014) (internal quotation marks omitted).

[5] The District Court also held that L.R. sufficiently stated a claim for municipal liability against the School District and the School Reform Commission under a failure to train and supervise theory. *See id.* at 599-601. Defendants' appeal

5

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. We exercise appellate jurisdiction over this interlocutory appeal pursuant to the collateral order doctrine. Under this doctrine, "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."[6] "This is so because qualified immunity . . . is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation."[7] Here, the disputed issues are whether the complaint sufficiently alleges a violation of a constitutional right and whether that right was clearly established at the time of the violation. Thus, appellate review is appropriate. Our review is plenary.[8]

## III.    DISCUSSION

The primary purpose of qualified immunity is to shield public officials "from undue interference with their duties and from potentially disabling threats of liability."[9] This immunity can be overcome, however, when public officials violate clearly established constitutional rights of which a

_____

concerns only the District Court's denial of Littlejohn's claim of qualified immunity.

[6] *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (internal quotation marks omitted).

[8] *Atkinson v. Taylor*, 316 F.3d 257, 261 (3d Cir. 2003).

[9] *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).

reasonable person would have been aware.[10]  In the words of the Supreme Court, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[11]

To resolve a claim of qualified immunity, courts engage in a two-pronged inquiry: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was "clearly established" at the time of the official's conduct.[12]  "[W]hether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded."[13] Thus the sufficiency of L.R.'s pleading is both "inextricably intertwined with" and "directly implicated by" Littlejohn's qualified immunity defense.[14]

### A.    Substantive Due Process Claim under the State-Created Danger Theory

The threshold question in any § 1983 lawsuit is whether the plaintiff has sufficiently alleged a deprivation of a constitutional right.  L.R.'s claim invokes the substantive component of the Due Process Clause of the Fourteenth Amendment, which "protects individual liberty against certain government actions regardless of the fairness of the

---

[10] *Id.* at 818.

[11] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

[12] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[13] *Iqbal*, 556 U.S. at 673.

[14] *Id.* (internal quotation marks omitted).

7

procedures used to implement them."[15]   In *DeShaney v. Winnebago County Department of Social Services*,[16] the Supreme Court explained that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."[17]  Rather, the purpose of the Clause is "to protect the people *from the State*, not to ensure that the State protect[s] [the people] from each other."[18]  Applying this principle, the Court held that state social workers did not deprive four-year-old Joshua DeShaney of substantive due process when they failed to remove him from a physically abusive household, despite their ongoing knowledge of suspected abuse by his father.[19]   The Court held that, "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."[20]   It suggested, however, that the result may have been different had the State played a role in creating or enhancing the danger to which Joshua was exposed.[21]

Building off that concept, we and other circuits have adopted a "state-created danger" exception to the general rule

---

[15] *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (internal quotation marks omitted).

[16] 489 U.S. 189 (1989).

[17] *Id.* at 195.

[18] *Id.* at 196 (emphasis added).

[19] *Id.* at 201-02.

[20] *Id.* at 197.

[21] *See id.* at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.").

that the Due Process Clause imposes no duty on states to protect their citizens from private harm.[22] In *Bright v. Westmoreland County*,[23] we clarified the elements necessary to successfully plead a state-created danger claim:

1. the harm ultimately caused was foreseeable and fairly direct;

2. a state actor acted with a degree of culpability that shocks the conscience;

3. a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

4. a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.[24]

---

[22] *See Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996) ("[W]e hold that the state-created danger theory is a viable mechanism for establishing a constitutional claim under 42 U.S.C. § 1983.").

[23] 443 F.3d 276 (3d Cir. 2006).

[24] *Id.* at 281 (citations and internal quotation marks omitted).

For the reasons set forth below, we hold that L.R. has sufficiently alleged all four of these elements and has therefore sufficiently pled a substantive due process violation.

### i. Affirmative Use of Authority Creating or Increasing Danger

We begin with the fourth element, as it is typically the most contested. This element asks whether the state's conduct created or increased the risk of danger to the plaintiff. As we noted in *Bright*, "[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."[25]

This element is often contested because of the inherent difficulty in drawing a line between an affirmative act and a failure to act.[26] Often times there is no clear line to draw;

_____

[25] *Id.* at 282.
[26] *See, e.g.*, *Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013) (en banc) ("[M]erely restating the Defendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct."); *Sanford v. Stiles*, 456 F.3d 298, 312 (3d Cir. 2006) (per curiam) ("Sanford has attempted to 'recharacterize' [the school guidance counselor's] failures as 'affirmative actions.' We believe that this case is more about [her] failure to *prevent* Sanford's death."); *D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1376 (3d Cir. 1992) (en banc) ("Accepting the allegations as true, [namely], that one school defendant was advised of the misconduct and apparently did not investigate, they show [inaction] but they do not rise to the level of a constitutional violation.").

virtually any action may be characterized as a failure to take some alternative action.[27] For example, Defendants attempt to reframe Littlejohn's alleged actions as inactions, or failures. They argue that Littlejohn's *failure* to follow School District policy, *failure* to obtain proper identification from Regusters, and *failure* to obtain verification from Regusters that Jane had been permitted to leave school are not *affirmative* acts. This strategy is unavailing.

Rather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the "status quo" of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo. This approach, which is not a new rule or concept but rather a way to think about how to determine whether this element has been satisfied, helps to clarify whether the state actor's conduct "created a danger" or "rendered the citizen more vulnerable to danger than had the state not acted at all."[28]

The setting here is a typical kindergarten classroom. Children in this setting are closely supervised by their teacher. Their freedom of movement is restricted. Indeed, they are not likely to use the bathroom without permission, much less wander unattended from the classroom. In the classroom, the teacher acts as the gatekeeper for very young children who are unable to make reasoned decisions about when and with whom to leave the classroom. Viewed in this

---

[27] *See Morrow*, 719 F.3d at 198 (Fuentes, J., dissenting).
[28] *Bright*, 443 F.3d at 281.

11

light, Jane was safe in her classroom unless and until her teacher, Littlejohn, permitted her to leave.

We can therefore easily distinguish Littlejohn's conduct from the state actors' conduct in *DeShaney*. The Supreme Court's focus in *DeShaney* was on the State's failure to remove Joshua a second time from a situation it had reason to believe was dangerous, meaning the State's decision to leave Joshua with his father was a maintenance of the status quo. Moreover, in responding to the argument that the State's action in previously intervening and then returning Joshua to his father gave rise to an affirmative duty to protect and remove him again, the Court further observed: "That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all."[29] In other words, had the State done nothing, Joshua would have been in the same dangerous position. The setting here, by contrast, was a kindergarten classroom where students presumably were safe from outside dangers. When Littlejohn allowed Jane to leave the classroom with an adult who failed to produce proper identification or verification, he exposed Jane to a danger she would not have otherwise encountered.

We can also distinguish this case from our decision in *Morrow v. Balaski*,[30] where we declined to find a state-created danger in a school setting. In *Morrow*, two high school students sued their school for failing to protect them from another student who was bullying them persistently.

---

[29] *DeShaney*, 489 U.S. at 201.
[30] 719 F.3d 160.

The school at one point temporarily suspended the bully but then allowed her to return to school, contrary to a school policy requiring expulsion of students adjudicated "guilty of a crime."[31]  We held that the school's failure to enforce its own disciplinary policy was not equivalent to an "affirmative act."[32]  Thus, *Morrow* paralleled *DeShaney* in that maintenance of the status quo was insufficient to create liability.

This case is different.  Littlejohn's actions resulted in a drastic change to the classroom status quo, not a maintenance of a situation that was already dangerous.  And unlike in *Morrow*, the presence or absence of a school policy is largely irrelevant to L.R.'s claim.  Littlejohn's actions in asking Regusters for proper identification and verification, and then permitting Jane to leave with Regusters despite her failure to produce either, amounted to an affirmative misuse of his authority as Jane's teacher and "gatekeeper."

Defendants contend that there is no constitutional right to have a school official intervene to prevent an unauthorized person from removing a child from school.  But this was not just a failure to intervene.  Under the facts as pled, Littlejohn had the authority to release Jane from his classroom and used it. By allowing Jane to leave his classroom with an unidentified adult, Littlejohn "created or increased the risk [of harm] itself."[33]

---

[31] *Id.* at 178.

[32] *Id.*

[33] *Id.* at 186 (Ambro, J., concurring in part and dissenting in part).

13

We find clear parallels between this case and our seminal state-created danger case, *Kneipp v. Tedder*.[34] There, police officers stopped a couple walking home from a tavern, released the husband first to relieve the babysitter, and then left the visibly intoxicated wife to walk home alone in the cold. Police later discovered the wife unconscious at the bottom of an embankment near her home. She suffered permanent brain damage as a result of her exposure to the cold. We concluded that the officers created a dangerous situation or at least made the intoxicated woman more vulnerable to danger. This was because the officers chose to displace the caretaker of someone who was clearly unable to care for herself. Having taken on responsibility for the woman's wellbeing, the officers thereafter abandoned it and, in so doing, subjected a vulnerable individual to an obvious risk of harm—walking home alone in the cold while highly intoxicated.

The dynamic of a kindergarten classroom is similar. The state is responsible for the safety of very young children unable to care for themselves. Indeed, it is a responsibility the state undertakes when young children are left in its care. When Littlejohn surrendered that responsibility by releasing Jane to an unidentified adult, thereby terminating her access to the school's care, he affirmatively misused his authority just as culpably as the officers in *Kneipp* misused theirs.

Our decision in *Horton v. Flenory*[35] is similarly instructive. In that case, a police officer intervened in a dispute between a night club owner and a crime suspect, then

---

[34] 95 F.3d 1199.
[35] 889 F.2d 454 (3d Cir. 1989).

14

allowed the night club owner to interrogate the suspect, leading to the suspect's death.  We explained that the officer's action in delegating his authority to the night club owner was "anything but passive," as he "used his official status to confirm that [the night club owner] was free to continue the custodial interrogation" despite signs of physical mistreatment.[36]  In both *Horton* and this case, the particular responsibilities that were relinquished—interrogating suspects and protecting the safety of kindergarteners—were an integral part of the state actor's job functions.  In both cases, the state actor handed over their responsibility to a private actor who, under the circumstances, posed an obvious risk of harm to the plaintiff.  Such actions are an affirmative misuse of state authority.

### ii.  Foreseeable and Fairly Direct Harm

Next, we ask whether "the harm ultimately caused was a foreseeable and a fairly direct result of the state's actions."[37]  L.R. alleges that Littlejohn "w[as] aware that releasing pupils to unidentified and otherwise unverified adults would result in harm to those pupils, including but not limited to sexual assault."[38]  Defendants counter that the complaint is devoid of any facts that support the inference that Littlejohn could have known of Regusters' intent to harm Jane.  That is not the appropriate inquiry.  Rather, the plaintiff must only "allege an awareness on the part of the state actors that rises to the level of actual knowledge *or an awareness of risk* that is

---

[36] *Id.* at 458.

[37] *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 908 (3d Cir. 1997).

[38] Compl. ¶ 39.

sufficiently concrete to put the actors on notice of the harm."[39] We think the risk of harm in releasing a five-year-old child to a complete stranger was obvious.

A comparison of *Kneipp* with our decision in *Morse v. Lower Merion School District*[40] illustrates this concept. In *Kneipp*, we explained that a highly intoxicated woman was "more likely to fall and injure herself if left unescorted than someone who was not inebriated,"[41] and we indicated that the police officers' "ordinary common sense and experience" sufficiently informed them of this risk.[42] By contrast, we held in *Morse* that school officials could not have foreseen that allowing construction workers to leave the school's rear entrance unlocked would result in the fatal shooting of a teacher by a trespasser. We explained that there was no allegation that the school was aware of the assailant or anyone else posing a credible threat of violence to persons inside the school. Rather, the only facts alleged that would have alerted school officials to any danger were that there had been "previous 'security breaches' by unnamed persons" and the assailant had been seen loitering in the school area the week before the shooting.[43] This, we held, was not enough to

---

[39] *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008) (emphasis added).
[40] 132 F.3d 902.
[41] *Kneipp*, 95 F.3d at 1208.
[42] *Phillips*, 515 F.3d at 237 (citing *Kneipp*, 95 F.3d at 1208; *cf. Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989) (noting the "inherent danger facing a woman left alone at night in an unsafe area is a matter of common sense").
[43] *Morse*, 132 F.3d at 908.

16

warn officials that a person "would enter the school in search of a victim."[44]

Here, it was foreseeable that releasing a young child to a stranger could result in harm to the child. This inherent risk is not only a matter of experience as a teacher in charge of a kindergarten classroom, but, as in *Kneipp*, it is also a matter of common sense. Regardless of which of the many apparent risks of harm—whether kidnapping, child pornography, human trafficking, sexual assault or some other violation—came to pass, Littlejohn knew, or should have known, about the risk of his actions.

We also conclude that the harm ultimately caused to Jane was a fairly direct result of Littlejohn's conduct. We have explained that, although this inquiry is fact-specific, "a distinction exists between harm that occurs to an identifiable or discrete individual . . . and harm that occurs to a 'random' individual with no connection to the harm-causing party."[45] In *Morse*, we declined to find the school's decision to allow the back door to remain open to be the "catalyst for the attack" on the teacher because "[t]he causation, if any, [was] too attenuated."[46] Here, randomness and attenuation are not in play. Littlejohn released Jane directly to the unidentified adult who sexually assaulted her the same day. On the facts as pled, Littlejohn's actions were indeed the "catalyst for the attack."

---

[44] *Id.*

[45] *Phillips*, 515 F.3d at 239.

[46] *Morse*, 132 F.3d at 909-10.

### iii.    Conscience-Shocking Conduct

We next consider whether Littlejohn's actions "shock the conscience." The Supreme Court has emphasized that the "touchstone of due process" is protection against arbitrary government action.[47] Government action is "arbitrary in the constitutional sense"[48] when it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."[49]

The level of culpability required for behavior to shock the conscience largely depends on the context in which the action takes place. In a "hyperpressurized environment," such as a high-speed police chase, intent to harm is required.[50] But in situations "where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient."[51] On the facts as pled, the appropriate culpability standard here is deliberate indifference, since there is nothing to indicate that Littlejohn faced circumstances requiring him to make a quick decision. We have defined deliberate indifference as requiring a "conscious disregard of a substantial risk of serious harm."[52] That is, "deliberate indifference might exist without actual

---

[47] *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (internal quotation marks omitted).

[48] *Id.* at 846 (quoting *Collins*, 503 U.S. at 129).

[49] *Id.* at 847 n.8.

[50] *Sanford*, 456 F.3d at 309.

[51] *Id.*

[52] *Vargas v. City of Philadelphia*, 783 F.3d 962, 973-74 (3d Cir. 2015) (quoting *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002) (internal quotation marks omitted)).

18

knowledge of a risk of harm when the risk is so obvious that it should be known."[53]

As we have already explained, the risk of harm in releasing a five-year-old child to an unidentified, unverified adult is "so obvious" as to rise to the level of deliberate indifference. The fact that there was a school policy in place prohibiting the release of pre-kindergarten through eighth grade students to an adult without proper documentation tends to show that school officials were aware that releasing a young child to a stranger is inherently dangerous. What is more, whether or not that policy existed, the fact that Littlejohn asked Regusters for her identification illustrates that Littlejohn himself was indeed aware of the risk of harm in releasing Jane to a stranger, even if he was unaware of Regusters' specific criminal intent. That he *still* allowed Jane to leave despite Regusters' failure to produce identification or verification, we think, rises to conscience-shocking behavior.

To support their contention that Littlejohn's conduct could not shock the conscience, Defendants direct us to *Doe ex rel. Magee v. Covington County School District*,[54] a Fifth Circuit case with some factual similarity to this case. In *Doe*, school employees on six separate occasions allowed a nine-year-old student to be checked out from school by a man claiming to be her father but who bore no relationship to her and was not listed on her check-out form. On each occasion, the man sexually assaulted the young student and then returned her to school. The Fifth Circuit concluded that, even

---

[53] *Phillips*, 515 F.3d at 241 (quoting *Sanford*, 456 F.3d at 309).

[54] 675 F.3d 849 (5th Cir. 2012) (en banc).

19

assuming it recognized a state-created danger theory (to date it has not officially adopted this doctrine), the allegations failed because the complaint did "not allege that the school knew about an immediate danger to [the student's] safety."[55] By contrast, we are comfortable concluding that Littlejohn's conduct in releasing Jane to an adult who failed to identify herself demonstrated a "conscious disregard of a substantial risk of serious harm."[56]

### iv. Foreseeable Victim

The "foreseeable victim" element requires that some sort of relationship exist between the state actor and the plaintiff such that the plaintiff was a foreseeable victim of the state actor's conduct.[57]  This element is satisfied easily here.

---

[55] *Id.* at 866.

[56] *Vargas*, 783 F.3d at 973-74 (quoting *Ziccardi*, 288 F.3d at 66 (internal quotation marks omitted)).

[57] A "special relationship" is not required.  Indeed, this is an entirely separate theory on which to base a substantive due process claim, applicable when "the State takes a person into its custody and holds him there against his will."  *Morrow*, 719 F.3d at 167 (quoting *DeShaney*, 489 U.S. at 199-200).  In the public high school context, we have explained that compulsory attendance laws and *in loco parentis* authority do not give rise to a special relationship between schools and their students.  *Id.* at 171-72; *Middle Bucks*, 972 F.2d at 1371-72.  In *Morrow*, however, we left open the possibility that a special relationship between a school and its students could arise under certain "unique and narrow circumstances," 719 F.3d at 171, as when a school locks classroom doors or otherwise imposes limitations on a student's "freedom to act

Jane was a member of the discrete class of kindergarten children for whose benefit the School District's release policy had been instituted. In this sense, Jane was a foreseeable victim of Littlejohn's actions.

For these reasons, we conclude that L.R. has sufficiently alleged all the elements of a state-created danger claim.

### B.    Whether the Right was Clearly Established

Having concluded that L.R. has sufficiently alleged a violation of her daughter's substantive due process rights, we next ask whether the right was clearly established at the time of Littlejohn's actions. We conclude it was. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"[58] The

_____

on his own behalf." *Id.* at 181 (quoting *DeShaney*, 489 U.S. at 200). We have never addressed the special relationship theory in the context of a school's youngest and most vulnerable students. Although we decline to do so here, as L.R. does not raise this claim, we note that, at some point, the age and/or dependency of certain students in combination with restraints a school may place on its students may indeed forge a "special relationship." *See, e.g.*, *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) ("*Except perhaps when very young*, the child is not physically restrained from leaving school during school hours . . . ." (emphasis added)).

[58] *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

ultimate question is whether the state of the law when the offense occurred gave Littlejohn "fair warning that [his] alleged treatment of [Jane] was unconstitutional."[59] We look first to applicable Supreme Court precedent. "Even if none exists, it may be possible that a 'robust consensus of cases of persuasive authority' in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity."[60]

Defining the right at issue is critical to this inquiry. We must frame the right "in light of the specific context of the case, not as a broad general proposition."[61] "The dispositive question is whether the violative nature of *particular* conduct is clearly established."[62] "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."[63] The Supreme Court has explained that, "[a]lthough earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."[64] Indeed, the Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[65]

---

[59] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[60] *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam)).

[61] *Saucier*, 533 U.S. at 201.

[62] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).

[63] *Anderson*, 483 U.S. at 640.

[64] *Hope*, 536 U.S. at 741 (internal quotation marks omitted).

[65] *Id.* (citing *United States v. Lanier*, 520 U.S. 259 (1997)).

We stressed this concept in *Estate of Lagano v. Bergen County Prosecutor's Office*.[66] There too the plaintiff filed a § 1983 lawsuit under the state-created danger theory, claiming that police officers' improper disclosure of Lagano's status as a confidential informant ultimately led to his murder. After defining the right at issue as "a confidential informant's constitutional right to nondisclosure," the district court explained that there was no binding precedent acknowledging such a right in the state-created danger context and, accordingly, it granted the officers' qualified immunity.[67] We vacated that decision. We explained that the district court's "unduly narrow construction of the right at issue" missed the mark, and exact congruence between prior cases and the current case was not required.[68] Rather, the proper inquiry was "whether the facts averred by the Estate fall within the elements of the state-created danger theory, and whether it would be clear to a reasonable officer that the alleged disclosure was unlawful under the circumstances."[69]

Defendants argue that the District Court defined Jane's right at the highest level of generality: "[Jane's] Fourteenth Amendment right to bodily integrity . . . under the state-created danger theory."[70] We agree that this definition is too

---

[66] 769 F.3d 850 (3d Cir. 2014).

[67] *Id.* at 859.

[68] *Id.*

[69] *Id.* (internal quotation marks omitted); *see, e.g.*, *Mammaro*, 814 F.3d at 169 (explaining that, in defining the right at issue, the court must "consider the substantive due process right of Mammaro as a parent in light of the specific allegations in her amended complaint").

[70] *L.R.*, 60 F. Supp. 3d at 596.

broad. Individuals indeed have a broad substantive due process right to be free from "unjustified intrusions on personal security."[71] For example, the Supreme Court has described this "historic liberty interest" as "encompass[ing] freedom from bodily restraint and punishment."[72] In light of the specific allegations in the complaint, however, the right at issue here is an individual's right to not be removed from a safe environment and placed into one in which it is clear that harm is likely to occur, particularly when the individual may, due to youth or other factors, be especially vulnerable to the risk of harm. Framed in this way, and surveying both our case law and that of our sister circuits, we conclude that this right was clearly established at the time of Littlejohn's actions. Although there is no case that directly mirrors the facts here, as in *Estate of Lagano*, there are sufficiently analogous cases that should have placed a reasonable official in Littlejohn's position on notice that his actions were unlawful.

Our decision in *Kneipp* is key. There, the officers' decision to separate an intoxicated woman from her caretaker at the time, her husband, and the subsequent abandoning of the woman in her vulnerable state, led us to conclude that the officers could be liable for creating or enhancing the danger to which the woman was exposed. Similarly, in *Rivas v. City of Passaic*,[73] we held that emergency medical technicians who told police officers that a man in the midst of a seizure had assaulted them, but failed to tell them about the man's medical condition, could have created or enhanced the danger

---

[71] *Ingraham*, 430 U.S. at 673.

[72] *Id.* at 673-74.

[73] 365 F.3d 181 (3d Cir. 2004).

24

that ultimately led to his death.[74] We explained that, at the time of the defendants' actions, it was clearly established that "state actors may not abandon a private citizen in a dangerous situation, provided that the state actors are aware of the risk of serious harm and are partly responsible for creating the opportunity for that harm to happen."[75]

Other circuits have come to similar conclusions under analogous circumstances. For example, in *White v. Rochford*,[76] the Seventh Circuit held that police officers who "abandon children and leave them in health-endangering situations after having arrested their custodian and thereby deprived them of adult protection" violate the children's "right to be free from unjustified intrusions upon physical and emotional well-being."[77] There, officers arrested the children's uncle for drag racing, then left the children with the immobilized car on a major highway on a cold evening.[78] The concurring judge explained that arresting the uncle removed the children's only protection against danger, and by not providing any alternative protection, the officers unnecessarily exposed the children to obvious hazards.[79] As the Seventh Circuit later articulated in *Bowers v. DeVito*,[80] "[i]f the state puts a [person] in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an

---

[74] *Id.* at 194-95.

[75] *Id.* at 200.

[76] 592 F.2d 381 (7th Cir. 1979).

[77] *Id.* at 382, 386.

[78] *Id.* at 382.

[79] *Id.* at 387-88 (Tone, J., concurring).

[80] 686 F.2d 616 (7th Cir. 1982).

active tortfeasor as if it had thrown him into a snake pit."[81] Similarly, in *Wood v. Ostrander*,[82] the Ninth Circuit held that a police officer who left a female passenger stranded late at night in a high-crime area after arresting the driver violated her constitutional right to personal security.[83] The court explained that "the inherent danger facing a woman left alone at night in an unsafe area is a matter of common sense."[84]

This notion is not limited to circumstances in which police officers abandon private citizens in dangerous situations. In *Currier v. Doran*,[85] the Tenth Circuit held that the plaintiff sufficiently pled a state-created danger claim when state social workers failed to investigate numerous allegations of child abuse and recommended that the children's abusive father assume legal custody.[86] In denying

---

[81] *Id.* at 618.

[82] 879 F.2d 583 (9th Cir. 1989).

[83] *Id.* at 590 ("The fact that [the officer] arrested [the driver], impounded his car, and apparently stranded Wood in a high-crime area at 2:30 a.m. distinguishes Wood from the general public and triggers a duty of the police to afford her some measure of peace and safety.").

[84] *Id.*

[85] 242 F.3d 905 (10th Cir. 2001).

[86] *Id.* at 919-20. In distinguishing these circumstances from *DeShaney*, the Tenth Circuit explained that, "[i]n this case, Anthony and Latasha were removed from their mother and placed with their father. In *DeShaney*, Joshua was removed from his father and then returned to his father." *Id.* at 918. Thus, "Anthony and Latasha would not have been exposed to the dangers from their father but for the affirmative acts of the state; the same cannot be said for Joshua in *DeShaney*." *Id.*

qualified immunity, the court concluded that a reasonable state official at the time would have known that "reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional."[87] The Tenth Circuit had previously held that the parents of a special education student who committed suicide established a state-created danger claim when school officials sent the student home after he was acting up in school, despite knowing that he was having suicidal thoughts, he had access to firearms in his house, and his parents were not home.[88]

Against this backdrop, we conclude that the state of the law in 2013 was sufficiently clear to put Littlejohn on notice that permitting a kindergarten student to leave his classroom with an unidentified adult could lead to a deprivation of that student's substantive due process rights.[89]

---

[87] *Id.* at 924.

[88] *Armijo by and through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1264 (10th Cir. 1998).

[89] *See also Frances-Colon v. Ramirez*, 107 F.3d 62, 63-64 (1st Cir. 1997) (explaining that a substantive due process violation occurs when a state actor "affirmatively acts to increase the threat of harm to the claimant or affirmatively prevents the individual from receiving assistance"); *Pinder v. Johnson*, 54 F.3d 1169, 1177 (4th Cir. 1995) ("[S]tate actors may not disclaim liability when they themselves throw others to the lions."); *Sciotto v. Marple Newton Sch. Dist.*, 81 F. Supp. 2d 559, 570 (E.D. Pa. 1999) (concluding that "it was clearly established . . . that a student enjoy[s] a constitutional right to be free from school officials' deliberate indifference to, or acts that increase the risk of serious injury from[,]

27

## IV. CONCLUSION

State-created danger cases often involve unsettling facts and this case is no different. Even so, our resolution of the legal issues is straightforward. Exposing a young child to an obvious danger is the quintessential example of when qualified immunity should not shield a public official from suit. Accordingly, the order of the District Court is affirmed.

unjustified invasions of bodily integrity perpetrated by third parties").