NYGAARD, Circuit Judge,
concurring in the part, dissenting in part.
I agree with the majority that the cause must be remanded. Because I conclude that the First Amendment right at issue is and was clearly established, I dissent.
The question of whether a constitutional right is clearly established has to be considered in a real-world context; this is why our analysis is conducted from the perspective of a “reasonable official.” L.R. v. Sch. Dist. of Phila., 836 F.3d 235, 247-48 (3d Cir. 2016) (alteration and citations omitted). Such an approach protects public officials — particularly our police officers in the field — from uncertainty about the precise boundary of a particular constitutional right when situations arise that have not yet been considered by the courts. None *363 theless, we must apply this “reasonable official” analysis consistently, recognizing that there are instances — rare though they may be — when any reasonable official in the circumstance would know the boundaries of a constitutional right well before we have ruled on it. I am confident that this is one of those cases because of the unique combination of a number of factors.
First, as the majority notes, every Circuit Court of Appeals that has considered the issue ruled that there is a First Amendment right to record police activity in public. Four of these decisions were published before the conduct at issue here, and two of them occurred after our decision in Kelly v. Borough of Carlisle, 622 F.3d 248 (3d Cir. 2010), in which we posited that the right was not clearly established at that time. See Am. Civil Liberties Union of III. v. Alvarez, 679 F.3d 583 (7th Cir. 2012); Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011); Smith v. City of Cumming, 212 F.3d 1332 (11th Cir. 2000); Fordyce v. City of Seattle, 55 F.3d 436 (9th Cir. 1995).[1] I am convinced that such a “robust consensus,” alone, sufficiently grounds a ruling that the right is clearly established. L.R., 836 F.3d at 247-48. However, our record goes far beyond that.
The Police Department’s official policies explicitly recognized this First Amendment right well before the incidents under review here took place. Captain Frank Healy of the Department’s Research and Planning Unit stated that, in 2011, officers did “not understand the police [were] allowed to be taped in public.” App. 119 (2013 Healy dep. at 54). Because there was “some confusion on the street” he testified that there “was a definite need for the policy.” App. 121 (2013 Healy dep. at 62). He said that the Department wanted “to be on the forefront rather than on the back end,” of educating its officers on this issue, prompting Police Commissioner Charles Ramsey to request that a policy be written requiring police officers to “allow citizens to record the police.” App. 118 (2013 Healy dep. at 52). The policy was intended to get “clarification out on the street so the officers knew what their duties [were].” App. 120 (2013 Healy dep. at 59). It issued a memorandum in September, 2011 stating that police should reasonably expect to be photographed, videotaped and or audibly recorded by members of the general public. Commissioner’s Memorandum 11-01, issued on September 23, 2011, made clear to all Philadelphia police officers that they “shall not” obstruct or prevent this conduct, and that “under no circumstances” were permitted to disable or damage the devices being used. App. 1185.
In the year that followed publication of the memorandum, Internal Affairs received eight complaints by citizens of retaliation by police for recording' police performing their duties. App. 1569. Additionally, the U.S. Department of Justice issued recommendations in May, 2012, that all police departments “affirmatively set forth the First Amendment right to record police activity.” App. 1675. As a result, the Commissioner directed Captain Healy and his unit to revise the Memorandum to incorporate the Department of Justice recommendations. The revised document was issued as Departmental Directive 145 on November 9, 2012. Like a Memorandum, a Directive is also official Departmental policy, but it covers a topic in greater depth.
Directive 145 plainly requires officers to allow citizens to make recordings of police activity. The Directive uses, verbatim, the *364 language of the Department of Justice’s recommendation, stating that its purpose was to “protect the constitutional rights of individuals to record police officers engaged in the public discharge of their duties.” App. 1187. It said, further, that “observing, gathering, and disseminating of information ... is a form of free speech.” Id. Police officers were prohibited from “blocking, obstructing, or otherwise hindering” recordings made by persons “unless the person making such recording engages in actions that jeopardize the safety of the officer, any suspects or other individuals in the immediate vicinity, violate the law, incite others to violate, or actually obstruct an officer from performing any official duty.” Id. As it was published, the Department mandated that a sergeant read it at every roll call, Department-wide. Each police officer also. received a copy of the Directive and was required to sign that they received it.
Although the Directives declared a First Amendment right well ahead of this Court, the Philadelphia Police Department Commissioner had a desire to “get out ahead” of what he presciently viewed as an inevitable ruling. With all of this, it is indisputable that all officers in the Philadelphia Police Department were put on actual notice that they were required to uphold the First Amendment right to make recordings of police activity. From a practical perspective, the police officers had no ground to claim ambiguity about the boundaries of the citizens’ constitutional right here. Mindful of the established trend among the Circuit Courts of Appeals, this combined with this clear Guidance from the Commissioner sufficiently grounds a conclusion that the right to record official, public police activity was clearly established and “beyond debate.” Zaloga, 841 F.3d at 175 (quoting Reichle, 132 S.Ct. at 2093). However, this, too, ignores another piece of the context of this case that should be considered as part of the “reasonable official” inquiry.
The majority cites to the 2011 article of Seth F. Kreimer,[2] in which he notes that, given the ubiquity of personal electronic devices with cameras, “[w]e live, relate, work, and decide in a world where image capture from life is routine, and captured images are part of ongoing discourse, both public and private. Capture of images has become an adjunct to memory and an accepted medium of connection and correspondence.” Seth F. Kreimer, Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record, 159 U. Pa. L. Rev. 335, 337 (2011). If we are to assess the issue from a reasonable officer perspective, we cannot artificially remove him or her from this widespread societal phenomenon. (Indeed, it is not unreasonable to speculate that most— if not all — of the police officers themselves possessed such a personal electronic device at the time that the incidents underlying these cases took place.) A reasonable police officer would have understood, firsthand, the significance of this proliferation of personal electronic devices that have integrated image capture into our daily lives, making it a routine aspect of the way in which people record and communicate events. Apart from any court ruling or official directive, the officers’ own lived experience with personal electronic devices (both from the perspective of being the one who is recording and one who is being recorded) makes it unreasonable to assume that the police officers were oblivious to the First Amendment implications of any attempt by them to curtail such recordings.
*365 As I noted above, I concur with the majority’s analysis and conclusions regarding the existence of a First Amendment right to record, and agree that the case against the City of Philadelphia should be remanded for further proceedings. However, in light of the social, cultural, and legal context in which this case arose, I am convinced that — in this unique circumstance — no reasonable officer could have denied at the time of the incidents underlying these cases that efforts to prevent people from recording their activities infringed rights guaranteed by “the First Amendment. For these reasons, I dissent from the majority’s conclusion that the police officers are immune from suit.

. Two more recent decisions reinforce the trend. See Turner v. Lieutenant Driver, 848 F.3d 678 (5th Cir. 2017); Gericke v. Begin, 753 F.3d 1 (1st Cir. 2014).

. Professor, University of Pennsylvania Law School.